Shirley **BAKER**, Plaintiff.

v.

**DANEK MEDICAL**, et al., Defendants.

Nos. GCA 95CV10033 MMP,
GCA 95CV10154 MMP.

United States District Court,
N.D. Florida,
Gainesville Division.

Sept. 1, 1998.

Thomas J. Kliebert, Jr., Kliebert & Heltz PC, Gramercy, LA, for Shirley A. Baker, plaintiff.

Stephen B. Gallagher, Marks Gray Conroy Etc, Victor M. Halbach, Marks Gray Conroy, William M. Corley, Marks Gray Conroy, M. Scott Thomas, Marks Gray Conroy J. Richard Moore, Moore Smith & Moore, Jacksonville, Mitchell A. Stearn, K. Thomas Shahriari, Porter Wright Morris Etc, Washington, DC, Edwin S Gault, Jr., Roland M. Slover, Fred Krutz, III, Daniel J Mulholland, David H. Fulcher, Forman Perry Watkins, Jackson, MS, Janet L MacDonell, W. Lee Kohler, Joseph L. McReynolds, Douglas R Elliott, Deutsch Kerrigan & Stiles LLP, New Orleans, LA, James Craig Corbett, Fisher Rushmer Werrenrath, Orlando, FL, Daniel J. Santaniello, Daniel J Santaniello PA, Daniel J Koleos, Luks Koleos & Santaniello, Fort Lauderdale, Rutledge Richardson Liles, Liles Gavin & Costantino, Raymond Scott Costantino, Liles Gavin & Costantino, Jacksonville, Robert O. Stripling, Stripling McMichael & Stripling PA, Gainesville, Constance Daniels, Constance Daniels PA, Tampa, Charles R Daniels, II, Stanton Shuler, Jr., Leake & Andersson LLP, New Orleans, LA, Richard J. Suarez, Hardeman & Suarez, Miami, William S Daskam, IV, Butler Burnette & Pappas, John W. Weihmuller, Butler Burnette & Pappas, Tampa, FL, Robert Reeder, Thomas R Harrington, Elizabeth J. Chambers, Cozen & O'Connor, Philadelphia, PA, Gordon James, III, Heinrich Gordon Hargrove Etc, Fort Lauderdale, FL, Cathy J. Goodwin, Heinrich Gordon Hargrove Etc, Orlando, Thomas G. Stayton, Baker & Daniels, Indianapolis, Albert J. Dahm, Baker & Daniels, Fort Wayne, IN, Susan S. Wettle, Ann E. Eberle, Brown Todd & Heyburn PLLC, Louisville, KY, for Danek Medical Inc, Sofamor Inc., Sofamore–Danek Group Incorporated, Sofamor S N C, Warsaw Orthopedic Incorporated, Eduardo Luque, Charles E. Johnston, II, Richard Ashman, Ph.D., George Rapp, Ensor Transfeldt, Hansen Yuan, John A. Herring, Thomas Whitecloud, III, Thomas A. Zdeblick, Texas Scottish Rite Hospital for Crippled Children, American Academy of Orthopedic Surgeons, North American Spine, North American Spine Society, Scoliosis Research Society, Acromed Corporation Charter Number 614043, Acromed Corp, Acromed Corporation Charter Number 614043, Acromed Inc, Acromed Incorporated, Acromed Incorporated, Charter Number 816943, Acromed Holding Corporation, Acromed Corporation Charter Number 614043, Ace Medical Company, Advanced Spine Fixation Systems Incorporated, Cross Medical Products, Depuy–Motech Incorporated, Scientific Spinal, Smith & Nephew Richards Inc, Synthes USA, Synthes Incorporated, Synthes North America Incorporated, Synthes AG, Zimmer Incorporated, Spinal Science Advancement Foundation, Youngwood Medical Specialties Incorporated fka National Medical Specialty Incorporated fka Stuart Medical Specialty Incorporated fka Stuart Medical Incorporated fka Stuart Drug and Surgical Supply Incorporated, Richard W. Treharne, PhD, Ermon R. Pickard, defendants.

## ORDER

PAUL, Senior District Judge.

Previously, in an order dated August 5, 1998, this Court granted all of the motions for summary judgment filed in this case except for that of the Danek defendants (doc. 71). For the reasons given below, that motion is now GRANTED.

The remaining claims in this case involve allegations that the injuries to the plaintiff were caused by bone screws manufactured

**878**

by the above defendants and used by Dr. Richard Fessler in the plaintiff. Specifically, the plaintiff seeks to recover under the following theories:

| | |
|---|---|
| Count I: | Fraud on the FDA |
| Count II: | Civil Conspiracy |
| Count III: | Concert of Action |
| Count IV: | Fraudulent Marketing and Promotion |
| Count V: | Negligent Misrepresentatin/Strict Liability under Restatement (Second) of Torts § 402B |
| Count VI: | Strict Liability in Tort |
| Count VIII: | Negligence |
| Count IX: | Breach of Implied Warranty of Merchantability |

■ As an initial matter, several of this counts can be dealt with quickly. First, Count I, regarding alleged fraud on the FDA, was previously dismissed by the MDL transferee court. *See In re Orthopedic Bone Screw Products Liability Litigation*, No. MDL 1014, 1997 WL 186325 *10–11 (E.D. Pa. filed April 16, 1997).[1] Further, Counts II and III, involving civil conspiracy and concert of action, were previously rejected by order of this court because the plaintiff could not prove actual reliance by her physician upon any representations made by the defendants. *See Baker v. Danek*, 35 F.Supp.2d 865 (N.D.Fla.1998). Likewise, Count IV, fraudulent marketing and promotion, must also be rejected because to recover for fraud under Florida law, the plaintiff must prove that she reasonably relied upon certain misrepresentations. *Kramer v. Unitas*, 831 F.2d 994, 998 (11th Cir.1987) (relying upon Florida law of fraud). As discussed more fully in the order of August 5, 1998, the plaintiff is unable to prove actual reliance upon any representation made by Danek or its alleged co-conspirators.

■ A similar fate befalls Count V, Negligent Mis representation/Strict Liability under Restatement (Second) of Torts § 402B, because reliance is an element of that theory of recovery. Under § 402B, a manufacturer who misrepresents or mislabels a material fact concerning the quality or safety of a product "is subject to liability for physical harm to a consumer of [the product]

caused by justifiable reliance upon the misrepresentation." As stated above, however, this Court has previously found that Dr. Fessler did not rely upon any representation, brochure or label in deciding to use the pedicle bone screws. Instead, he relied upon his own judgment. Accordingly, Count V should also be rejected.

■ With regard to Count VII, alleging liability per se for violations of the FDCA, the MDL transeree court previously ruled that no private cause of action existed under the FDCA. *In re Orthopedic Bone Screw Products Liability Litigation*, No. MDL 1014, 1997 WL 186325 (E.D. Pa. filed April 16, 1997). If the plaintiff is attempting to resurrect a private cause of action in this count, in the form of a negligence per se action, that attempt should be rejected under Florida law, *Jupiter Inlet Corp. v. Brocard*, 546 So.2d 1, 2–3 (Fla. 4th DCA 1988) (OSHA does not provide a basis for a private right of action and violations of it do not constitute negligence per se). Furthermore, the uncontroverted testimony of plaintiff's physician in this case was that FDA approval status of pedicle bone screws was not material to his decision whether or not to use them. He testified that doctors frequently use products off-label if the doctors, exercising independent judgment, regard the products as the best possible treatment for their patients. Accordingly, Count VII should be rejected.

■ With regard to Count IX, breach of implied warranty, that claim should be rejected because, since 1988, Florida courts have required privity between the manufacturer and the consumer of the product in order for the consumer to assert an implied warranty claim. *Kramer v. Piper Aircraft Corp.*, 520 So.2d 37 (Fla.1988). Here, it is undisputed that the product used in plaintiff's surgery was purchased by the hospital first, and then implanted into the plaintiff. The recipient of an implant is not in privity with the manufacturer when the implant is purchased by the plaintiff's medical provider. *T.W.M. and S.M. v. American Medical Sys-*

---

1. The plaintiff has moved (doc. 158) to alter, sever, and stay summary judgment regarding this issue so that the MDL transferee court's order could be appealed to the Third Circuit. The defendants have not yet responded. Nothing in the present order should be construed as a ruling on doc. 158.

*tems, Inc.* ., 886 F.Supp. 842, 844 (N.D.Fla. 1995) (recipient of penile implant not in privity with manufacturer because hospital first purchased implant from manufacturer). Accordingly, under Florida Law, Count IX should be rejected.

The two counts which remain are Count VI, alleging strict liability, and Count VIII, alleging negligence. As discussed more fully below, both of these claims should be rejected for the same two reasons. First, plaintiff, despite offering the affidavits of numerous experts, simply offers no proof of a defect in the bone screws, and, second, plaintiff's doctor was a learned intermediary who exercised independent professional judgment in choosing to use pedicle bone screws in the plaintiff.

■ In Count VI, plaintiff asserts strict liability in tort. In *West v. Caterpillar Tractor Co.,* 336 So.2d 80, 86–87 (Fla.1976), the Supreme Court of Florida adopted the doctrine of strict liability and summarized the elements of that claim, stating:

> Strict liability should be imposed only when a product the manufacturer places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. The user should be protected from unreasonably dangerous products or from a product fraught with unexpected dangers. In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages.

■ *Id.* Thus, plaintiff must prove two essential elements: first, that the product was defective and unreasonably dangerous; and, second, that the unreasonably dangerous defect was the proximate cause of her injuries. Plaintiff must do more than show a mere temporal relationship between increased pain and the implantation. *Cartwright v. Home Depot U.S.A., Inc.,* 936 F.Supp. 900, 906 (M.D.Fla.1996) ("causation opinion based solely on a temporal relation-

ship is . . . . insufficient to satisfy the requirements of Fed.R.Evid. 702"). The plaintiff must provide some proof of how the product was defective.

■ In the instant case Plaintiff's experts fail to offer testimony of anything other than a temporal connection between the implantation and symptoms suffered by plaintiff. Plaintiff's Expert, Dr. Yarus, for example, who is undoubtedly highly qualified, states only as follows:

> [T]he problems and difficulties which [the plaintiff] experienced in my opinion and to a reasonable degree of medical certainty are directly caused by the implantation of . . .[the Danek product] . . . [and] she continued to suffer from pain and discomfort until the explantation of the hardware. This precipitated further need for operative intervention. The metallic implants, therefore . . . caused the pseudoarthrosis as well as the need for operative intervention and further pain and disability.

(Expert Report of Doctor Lance Yarus, D.O.). Dr. Richard Levy made only the following speculative conclusion in his report:

> As of this time, I can state that there is probably an indirect or direct relationship between the operation of December 13, 1990 in which the metallic device was placed into Ms. Baker's low back and the neurological deficit noted clinically and by EMG nine months later on September 18, 1991.

Neither report offered a specific description of how the screws actually caused the injuries alleged in the instant case. Instead, Dr. Yarus and Dr. Levy only state a temporal connection between the implantation of the product and her symptoms. Dr. Yarus then uses that connection to conclude that the implants caused the psuedoarthrosis. Also, it should be noted that Dr. Yarus did not examine or speak with plaintiff before filing his report. Dr. Levy did not even state a direct connection between the device itself and the symptoms; instead, he merely noted a correlation between "the operation of December 13, 1990" and the symptoms.

In *Cali v. Danek,* 24 F.Supp.2d 941, at 951 (W.D.Wis.1998), the District Court faced sim-

ilar slim opinions by an expert (the expert merely testified that "there was instrumented fusion followed by neurological defect" *Id.* at 951) and concluded that the evidence was not sufficient to withstand summary judgment:

> Plaintiff's expert testimony ... amounts to nothing more than conclusory speculation that the mere fact of pedicle screw use somehow proves a connection to subsequent pain. An invitation to the jury to join in speculation is not sufficient medical causation testimony to defeat a summary judgment challenge.

Plaintiff responds that Dr. Yarus' conclusions regarding a temporal connection should be sufficient because they are supported by other evidence. In fact, in her reply to the motion for summary judgment, plaintiff states, "[i]n this case, in addition to the 'temporal coincidence' of plaintiff's increased back and leg pain immediately after the implantation of the [Danek product] into her spine, Dr. Yarus relies on the following facts:" (1) the use of the product led to pseudoarthrosis; (2) plaintiff's back pain diminished after explantation; (3) the medical literature supports findings that increased back pain is often caused by implantation of spinal fixation devices.

These facts provide only circular or speculative support, at best. First, regarding the pseudoarthrosis, Dr. Yarus based his opinion that the pseudoarthrosis was caused by the implants on the fact that the symptoms began after the implantation and subsided after the explant. In other words, he used the temporal coincidence to prove the causation of the pseudoarthrosis. Thus, it is bootstrapping to turn around and argue that the psuedoarthrosis provides independent corroboration of the temporal connection. The only reason the pseudoarthrosis was attributed to the implants was the temporal connection itself.

Second, fact number two above is simply the temporal coincidence itself; that is, the fact that the pain subsided after the explant is part of the temporal coincidence relied upon by Dr. Yarus as support for his conclusion of causation.

Finally, fact number three, that the medical literature supports the conclusion that "increased back pain is often caused by the implantation of spinal fixation devices such as the [Danek device]" (*Plaintiff's Response to the Motion for Summary Judgment*, doc. 110) is problematic. Dr. Yarus simply does not include any analysis of this literature and application to the facts in the instant case in his conclusory expert report. Even the cases cited by plaintiff require not only that other evidence *exist* supporting the expert's conclusions but that the expert give some indication that her analysis was *based on* that evidence. *Treadwell v. Dow–United Techs.*, 970 F.Supp. 974, 983 (M.D.Ala.1997) (admitting causation testimony where "analysis rests not only with temporal coincidence but also with plaintiff's proven allergic/hyperreative response to [the substance at issue in that case]") In *Treadwell*, the expert testified how the additional evidence affected his analysis and specifically stated that he relied upon it in reaching his conclusion. Also, in *Bowers v. Northern Telecom, Inc.*, 905 F.Supp. 1004 (N.D.Fl.1995), the expert specifically testified about the medical literature and how it affected his conclusion. In the instant case, Dr. Yarus does not review or set out the literature upon which he relied or how it affected his conclusion. Instead, he merely relies on the temporal coincidence of plaintiff's symptoms and the implantation.

A second problem with the use of the medical literature is that the view that pedicle screw fixation devices are unreasonably dangerous is hardly generally accepted in the scientific community and the literature relied upon by the plaintiffs is very general and speculative. While the Eleventh Circuit in *Wells v. Ortho Pharmaceutical*, 788 F.2d 741, 745 (11th Cir.1986) held that full-scale epidemiological studies are not required to prove causation, a plaintiff must still show that the basic methodologies used for reaching a certain conclusion are sound. *Id.*

The literature relied upon in the instant case provide no such basis. For example, generic expert Dr. Alexander, who is not a

medical doctor,[2] simply opined that there is considerable dispute over whether the use of an internal fixation device in spinal fusion surgery provides and tangible benefit over surgery without such a device, and that complication rates appeared to be significantly higher with the devices than without. However, as noted in footnote 2, the MDL judge ruled that Dr. Alexander was not qualified to offer opinions regarding the "clinical complications" of using pedicle screws. Thus, Dr. Alexander's report adds little evidentiary worth to this case. In any event, Dr. Alexander's testimony still does not touch upon at all what it is that is defective about the defendants' products, and does not specifically mention the defendants' product in his report. Several courts around the country addressing summary judgment motions by Danek have held that Dr. Alexander's report does not create a triable issue of fact. *See, e.g., Talley v. Danek,* 7 F.Supp.2d 725 (E.D.Va.1998) and *Theriot v. Danek,* No. 94–2646 (E.D. La. filed Dec. 5.1997).

The plaintiff also offers the testimony of Dr. Wellford, Dr. Frank Sloan and David Helfrey. These individuals' testimony merely involves the allegations of the marketing of the product despite a lack of FDA approval for the product; it does not touch upon or identify any design defect in Danek's product. As such, it does not offer any guidance on the remaining issues.

In sum, plaintiff has simply failed to provide any evidence, amounting to more than speculation, that demonstrates that the Danek device was defective, unreasonably dangerous or the cause of plaintiff's injuries. Accordingly, summary judgment is appropriate on Counts VI and VIII.

 Alternatively, to the extent that plaintiff's claims of defect are cast in terms of a failure to warn, summary judgment is appropriate on those two counts under the "learned intermediary doctrine." Under this doctrine, manufacturers of prescription medical products have a duty only to warn physicians, rather than patients, of the risks associated with the use of a product. *See Buckner v. Allergan Pharmaceuticals, Inc.,* 400 So.2d 820 (Fla. 5th DCA), review denied, 407 So.2d 1102 (Fla.1981). As spinal fixation devices are available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor. *Stanback v. Parke, Davis & Co.,* 657 F.2d 642 (4th Cir.1981); *Pfizer, Inc. v. Jones,* 221 Va. 681, 684, 272 S.E.2d 43 (1980). This is so because the prescribing physician, acting as a "learned intermediary" between the manufacturer and the consumer, weighs the potential benefits against the dangers in deciding whether to recommend the product to meet the patient's needs. *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). Thus, when adequate information is provided to the physician, the manufacturer will not be held liable despite the physician's failure to give notice to the patient. *See Stanback,* 657 F.2d at 645. Such information may be provided to the physician through the manufacturer's package insert. *See Barnette v. E.R. Squibb & Sons. Inc.,* 670 F.Supp. 650, 651 (E.D.Va. 1987).

 Even if the manufacturer provides inadequate information, however, the manufacturer will not be liable if the plaintiff's physician independently knew of the risks and failed to advise the plaintiff. *See Stanback,* 657 F.2d at 645. Hence, a plaintiff must not only show that a manufacturer's warning was inadequate, but that such inadequacy affected the prescribing physician's use of the product and thereby injured the plaintiff. *See id.* at 645–46.

 In the instant case, the plaintiff claims, first, that the brochure failed to warn of the specific injuries alleged by plaintiff and, second, that Danek undercut the warnings in the brochures by aggressively marketing the product for an off-label use. Neither of these arguments defeats the learned intermediary doctrine, however, because the

---

**2.** The MDL transferee court ruled that although Dr. Alexander (an expert in the field of orthopedic bioengineering) was qualified to testify regarding "orthopedic bioengineering and its relat-
ed disciplines", he was not qualified to render opinions on "clinical complications of pedicle fixation."

record in this case reveals that, independent of any warning, Dr. Fessler was fully aware of all the risks and benefits of implant the defendant's devices. As stated more fully in the August 5, 1998 order granting summary judgment on the conspiracy and concert of action counts, Dr. Fessler was an expert in pedicle screw fixation surgery. Dr. Fessler is a board-certified neurosurgeon who specializes in spinal surgery. He has extensive training and experience in pedicle fixation with screws, including on-hands training from an orthopedic surgeon colleague at the University of Florida. He has performed hundreds of instrumented spinal fusion operations, and is well aware of the appropriate risks incumbent with this instrumentation. Moreover, Dr. Fessler has conducted independent research regarding the success and complications of spinal instrumentation. In fact, in 1992, he published the results of his research in a peer-reviewed article in the Journal of Neurosurgery entitled "Transpedicular Screw Fixation of the Lumbar Spine, Operative Technique and Outcome in 104 Cases." In short, Dr. Fessler is a paradigm example of a learned intermediary with regard to pedicle bone screw implantation.

Thus, because Dr. Fessler independently knew of, and evaluated the risks and benefits of, pedicle screw use, his professional independent judgment insulates the manufacturer from a failure to warn claim.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. The defendants' motion for summary judgment (doc. 71) is GRANTED.

2. The defendants' motion to strike expert testimony of Dr. Frank Sloan, David Helfrey and Norman Welford (doc. 141) is DENIED as moot.