Donald TUCKER and V. Belin
Tucker, Plaintiffs,

v.

NIKE, INC., Kinney Shoe Corporation
and Footlocker, Defendants.

Civ. No.: 2:93–CV–195.

United States District Court,
N.D. Indiana,
Hammond Division.

July 27, 1995.

William T. Enslen of Hammond, IN, for Plaintiffs.

Robert Parker of Hammond, IN for Defendant Nike.

Michael Blaize of Valparaiso, IN and Robert Parker of Hammond, IN, for Defendants Kinney Shoe and Footlocker.

## ORDER AND MEMORANDUM

SPRINGMANN, United States Magistrate Judge.

In this products liability action, the Plaintiffs, Dr. Donald Tucker and V. Belin Tucker, sued Nike, Inc., Kinney Shoe Corporation and Footlocker for injuries Dr. Tucker received during the course of a basketball game. In their Complaint, the Plaintiffs contend that the Nike Air Jordan VI shoe worn by Dr. Tucker at the time of the accident was a defective product which caused Dr. Tucker's achilles tendon to rupture.

Nike designed and manufactured the shoe and Footlocker sold it to Dr. Tucker on May 22, 1991. Tucker ruptured his achilles tendon while playing in a 3-on-3 basketball tournament in Gary, Indiana. Allegedly, the shoe "forcefully contacted" the back of Tuck-

er's foot while his foot was stressed due to the flexion normally associated with the game of basketball. Tucker contends that he suffered a ruptured left achilles tendon as a result of the shoe's forceful contact with his foot.

The alleged culprit in this case is the Nike Air Jordan VI's "back tab pull." The plastic "back tab pull" projects out from the back of the shoe above the heel. It is used to help pull the shoe onto the wearer's foot. In their complaint, the Plaintiffs contend that the back tab pull was overly rigid and was therefore defective. Under the Plaintiffs' theory, the back tab pull scraped against Tucker's achilles tendon whenever his foot was in "plantar flexion" during the course of the basketball game. Tucker contends that the rigid plastic of the back tab pull contacted his achilles tendon with sufficient force to cause his injury.

To support these claims, the Plaintiffs offer the expert testimony of Dr. George Tsoutsouris. In fact, the only evidence before this court on the issues of defective condition and causation come from the testimony of Dr. George Tsoutsouris.[1] On January 3, 1995, the Defendants moved for summary judgment. In their motion, the Defendants charge that Dr. Tsoutsouris' expert testimony is inadmissible under the principles enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. This Court now holds that Dr. Tsoutsouris' testimony is inadmissible and that Defendants are entitled to summary judgment in their favor.

## THE STANDARD FOR SUMMARY JUDGMENT

"[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that 'no reasonable jury could find for the non-moving party.'" *Dempsey v. Atchison, Topeka and*

---

**1.** At the hearing held July 7, 1995, counsel for the Plaintiffs represented that they had no other expert testimony. In addition, counsel for the Plaintiffs stated that the Plaintiff, himself a physician, would not testify as an expert in this case.

*Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir.1994) (citations omitted). "The burden rests squarely with the party moving for summary judgment to demonstrate that there is an absence of evidence to support the nonmoving party's case." *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994). The court views the facts presented on a motion for summary judgment in a light most favorable to the non-moving party, resolving all doubts in favor of that party. *See id.* "On the other hand, summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986)). In all of this, "the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.*

In this case, the Plaintiffs failed to timely respond to the Defendants' Motion for Summary Judgment. Under Fed.R.Civ.Proc. 56(e), the party opposing the motion

> may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse parties' response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party.

Fed.R.Civ.Proc. 56(e) (emphasis added). The Seventh Circuit has expressly endorsed the "exacting obligation" that this rule imposes on parties opposing summary judgment. *See Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994). ■ Rule 56 does not authorize the granting of summary judgment as a sanction for failing to file a timely response to a motion for summary judgment. *Tobey v. Extel/J.W.P., Inc.,* 985 F.2d 330, 332 (7th Cir. 1993). Instead, "if the party opposing summary judgment fails to respond to the facts set out by the movant, the court may assume those facts to be admitted and use them in determining whether the movant is entitled to judgment as a matter of law." *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 389 (7th Cir.1995); *Waldridge,* 24 F.3d at 922. The Local Rules of this court state the same principle. Where a party fails to oppose a summary judgment motion

> the court will assume that the fact[s] as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy.

L.R. 56.1. *See Curtis v. Bembenek,* 48 F.3d 281, 287 n. 7 (7th Cir.1995) (The party opposing the motion "may not rest upon the mere allegations or denials of his or her pleadings, otherwise the facts asserted in the movant's affidavits will be treated as true.").

Even though the court may not grant summary judgment as a sanction, the non-responding party faces summary judgment against them, if appropriate. "If appropriate" means "as a matter of the governing law." *Glass v. Dachel,* 2 F.3d 733, 739 (7th Cir.1993); *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983) (En banc). "Thus, by not responding to [the Defendants'] motion for summary judgment, the [Plaintiffs] were only admitting that no material issue of fact existed. The [Plaintiffs] did not waive all legal arguments based on those undisputed facts. If the court concludes that the same undisputed facts entitle either party to relief, it can so state." *Glass,* 2 F.3d at 739.

The Defendants contend that insufficient evidence exists to withstand a Motion for Summary Judgment on two elements of the Plaintiffs' claim: The existence of a defect with the shoe and a causal link between the alleged defect and the injuries suffered by Tucker. In particular, the Defendants challenge the only evidence Tucker offers to carry his burden on those issues: The opinion testimony of George Tsoutsouris, D.P.N., Tucker's expert podiatrist. They object to the admissibility of Dr. Tsoutsouris' crucial testimony on the grounds that it fails to meet the standards for expert testimony announced in *Daubert.*

## PLAINTIFFS' PRODUCTS LIABILITY CAUSE OF ACTION

■ In this products liability case between diverse parties, the Court will apply the law

of the state of Indiana. Indiana's Product Liability Act imposes liability on one who "puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer" for "physical harm *caused* by that product to the user or consumer." IND.CODE § 33–1–1.5–3(a) (emphasis added). The Act further provides that a product is "defective" if it is in a condition:

> (1) Not contemplated by reasonable persons among those considered expected users or consumers of the product; and

> (2) That will be unreasonably dangerous to the expected user or consumer when used in reasonably expected ways of handling or consumption.

IND.CODE § 33–1–1.5–2.5(a). *See Miller v. Todd*, 551 N.E.2d 1139, 1143 (Ind.1990). Thus, a plaintiff seeking to recover for personal injuries on a strict products liability theory has the burden of proving, among other things: (1) that the product in question was in a condition not contemplated by reasonable expected users of the product and (2) that the plaintiff suffered physical harm caused by the product's defective condition.

■ Dr. Tsoutsouris' testimony is the only evidence the Plaintiffs offer to carry their burden on the shoe's defective condition and the cause of the injuries. Therefore, without this expert's testimony, the Plaintiffs will have provided no evidence to sustain their burden on two essential elements of their case. For the expert's testimony to be considered by the court in deciding this motion for summary judgment, the expert's testimony must be admissible. *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 612 (1993); Fed.R.Civ.P. 56(e). If the Defendants' challenge to the expert's testimony is successful, the court cannot consider that testimony and the Plaintiffs will have failed to establish two elements of their case. "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552, 91 L.Ed.2d at 273 (1986). If Dr. Tsoutsouris' testimony is excluded, summary judgment must be entered against the Plaintiffs.

## THE ADMISSIBILITY OF EXPERT TESTIMONY

■ An expert's testimony is admissible under Rule 702 of the Federal Rules of Evidence if the testimony meets the standards laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert* the Court held that the Federal Rules of Evidence imposed a standard for admitting expert testimony that differed from the traditional Frye Test. The new standard is derived from Rule 702 which states:

> If *scientific, technical, or other specialized knowledge* will *assist the trier of fact* to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702 (emphasis added). The Court analyzed the wording of the rule and recognized two requirements: First, the testimony must be "scientific knowledge" in order to be admissible into evidence. Second, the testimony must "assist the trier of fact."

■ The first requirement mandates that the testimony be reliable. "Scientific knowledge" "implies a grounding in the methods and procedures of science." *Daubert*, 509 U.S. at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 481. The term "connotes more than subjective belief or unsupported speculation." *Id.* Finally, scientific knowledge "applies to any body of known facts or to any body of ideas from such facts or accepted as truths on good grounds." *Id.* In making its preliminary determination of admissibility under Rule 104(a), the court should not require that scientific testimony be " 'known' to a certainty." *Id.* Instead, the focus is on whether or not the testimony is "derived by the scientific method." *Id.*

■ The Court then noted four factors that courts should take into consideration when deciding the reliability of the methodology used by the expert:

> (1) whether a theory or technique can be and has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error; and

(4) the "general acceptance" of the theory. *Bradley v. Brown,* 42 F.3d 434, 437 (7th Cir.1994) (citing *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83.

■ The second requirement mandates that the expert's testimony be relevant. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. The court described the relevance requirement as one of "fit." Testimony which qualifies as "scientific knowledge" under Rule 702 is not admissible unless the expert credibly links his or her testimony to an issue in the case. The focus here is in the relevant link. The court decides whether the link between the scientific knowledge and the issues in the case qualify as a "scientific connection."

In effect, Dr. Tsoutsouris' testimony consists of two opinions: First, the shoe worn by Dr. Tucker was defective. Second, the defective shoe caused the injury to the Plaintiff. In his deposition, Dr. Tsoutsouris expresses his opinion that the back tab pull on the shoe in question was defective and unreasonably dangerous. Dr. Tsoutsouris bases his opinion on his conclusion that the back tab pull of the shoe forcefully contacted the achilles tendon of the Plaintiff during sudden or extreme plantar flexion. Under Dr. Tsoutsouris' hypothesis, the back tab pull was sufficiently rigid and came into contact with the achilles tendon with sufficient force to cause the rupture in this case. The Court will analyze Dr. Tsoutsouris' opinion on causation first as it will be dispositive in this case.

Dr. Tsoutsouris testified that, in his opinion, the back tab pull caused Dr. Tucker's achilles tendon to rupture. Dr. Tsoutsouris' hypothesis was based on his examination of the shoe in this case. When Dr. Tsoutsouris examined the shoe, he used a ruler, his eyes and his hands. He also brought to bear his many years of experience as a podiatrist. Dr. Tsoutsouris performed no other tests on the shoe. Based upon this examination, he concluded that the shoe was defective and unreasonably dangerous. Dr. Tsoutsouris also testified that, in his opinion, the defective design of the back tab pull caused Dr. Tucker's achilles tendon to rupture.

With regard to Dr. Tsoutsouris' methodology, neither party has provided the Court with information concerning the four factors for evaluating the admissibility of expert testimony listed in *Daubert. See supra.* While this court takes seriously the confidence which the Supreme Court has expressed in granting federal judges a "gatekeeping role" in the assessment of expert testimony (*Id.* at ——, ——, 113 S.Ct. at 2796, 2798, 125 L.Ed.2d at 482, 485.), the Court will not act as an "amateur scientist" in evaluating Dr. Tsoutsouris' look, feel and measure method of determining causation. *Id.* at ——, 113 S.Ct. at 2800, 125 L.Ed.2d at 487 (Rehnquist, J., concurring in part and dissenting in part).

Even without acting as an amateur scientist, though, the Court can recognize a severe problem with the proffered expert testimony concerning causation. The most troubling aspect of Dr. Tsoutsouris' testimony is his failure to consider other causes of the accident in forming his opinion. In his deposition, Dr. Tsoutsouris admitted that there are factors other than a person's shoes which can cause the achilles tendon to rupture. Tsoutsouris Deposition at 74. "Being out of shape, having diabetes or other metabolic disorders, . . . [p]laying beyond one's level for that time could be [ ] factor[s]." *Id.* The doctor also agreed that other factors, including the patient's age, activity level and whether or not he regularly engaged in a stretching or flexibility program, might affect the likelihood and cause of the injury to Dr. Tucker's achilles tendon. Despite the doctor's knowledge of these factors, Dr. Tsoutsouris never acted to exclude these factors as possible causes in this case. In fact, Dr. Tsoutsouris never bothered to discover the facts concerning these other factors. When asked about Dr. Tucker's athletic history, Dr. Tsoutsouris replied "I know that he liked to play basketball often I imagine—I can't say for certain whether he was just a weekend player or not. I don't know." Tsoutsouris Deposition at 39–

40. The following exchange reveals other factors about which Dr. Tsoutsouris failed to obtain information:

Q. Do you know whether he had any complaints about his achilles tendon before the injury?

A. He did not express that to me at any time.

Q. Did you ask him that?

A. I didn't ask him.

Q. Do you know if Dr. Tucker was in the habit of doing any sort of regular flexibility training specifically directed towards the achilles tendon?

A. I'm not aware of it.

Q. How about whether he had an opportunity to warm up or stretch or—

A. I'm not aware of that.

Q. —something like that before this particular injury?

A. I'm not aware of his practice patterns.

Q. Do you know how long he'd been playing the day he was injured?

A. I'm not aware of that, either.

Q. Do any of those things matter?

A. They could be factors....

Tsoutsouris Deposition at 41. Dr. Tsoutsouris' testimony provides no scientific basis for excluding these other factors as potential causes for the Plaintiff's injury. Had Dr. Tsoutsouris even considered these other factors, he could have conducted tests or at least arrived at a scientific explanation for why these other factors were not the cause of the injury in this case. The Court finds that Dr. Tsoutsouris' opinion as to the cause of the Plaintiff's accident is nothing more than "subjective belief" and "unsupported speculation" which is not the proper subject of expert testimony under *Daubert*. *See Porter*, 9 F.3d at 613.

The expert's opinion on causation also implicates *Daubert*'s second requirement of "fit." Under that requirement, the expert's opinion must have a "scientific connection" to the facts of the case. In addition to Dr. Tsoutsouris' speculation as to the cause of the accident in this case, the Court finds that his opinion does not "fit" the facts of this case. Dr. Tsoutsouris' opinion states that the back tab pull ruptured the achilles tendon when it scraped against the achilles tendon while the foot was in sudden and extreme plantar flexion. According to Dr. Tsoutsouris, "sudden and extreme plantar flexion" occurs when a person jumps or lands from a jump. Tsoutsouris Deposition at 68. Simply running up and down the basketball court does not cause sudden and extreme plantar flexion. Instead, the plantar flexion that happens while running is "relatively smooth." *Id.* Dr. Tsoutsouris' opinion is based on the fact that Dr. Tucker was in "extreme and sudden" plantar flexion at the time of the accident. In other words, Dr. Tsoutsouris' opinion is based on the fact that Dr. Tucker was jumping or landing from the jump when his achilles tendon ruptured. *Id.* ("Q. Did Dr. Tucker describe at all the type of jump or landing he was making at the time of his injury? A. He described going up for the ball and coming back down.").

According to Dr. Tucker, however, he was not in the process of jumping or landing from a jump when the accident occurred. In his deposition, Dr. Tucker stated, "They threw the ball to me like out at the top of the circle. All I was doing was looking at the basketball. I went to shoot just like this. Didn't jump, cause I really can't jump. But if I could see the basket, I usually can score." Tucker Deposition at 42. When asked a second time about his movements at the time of the injury Dr. Tucker stated, "This guy was really playing off me, he wasn't really on me. He was tired. And I just went like that. Didn't jump, just kind of bent my knees and fell to the ground." Tucker Deposition at 43.

Dr. Tsoutsouris based his opinion as to causation on the fact that Dr. Tucker was jumping or landing from a jump when the injury occurred. Tsoutsouris Deposition at 62. Whether or not Dr. Tucker was jumping or landing from a jump at the time of the accident is crucial because only jumping or landing from a jump causes "sudden and extreme" plantar flexion. Simply running up and down the court is "relatively smooth." Dr. Tucker's statement to the effect that he did not jump reveals that Dr. Tsoutsouris was unaware of the basic facts upon which he

based his opinion. Importantly, the distinction between jumping and not jumping is the same distinction made by Dr. Tsoutsouris between the kind of plantar flexion which is necessary for this kind of accident ("sudden and extreme") and the kind which would not allow this kind of accident ("relatively smooth").

Dr. Tsoutsouris' opinion as to causation does not "fit" the facts of this case. Dr. Tsoutsouris based his opinion on the fact that Dr. Tucker was "jumping or landing from a jump" or "going up for the ball and coming back down." Dr. Tucker himself testified that he "didn't jump." This expert's opinion, no matter how scientific or unscientific, does not fit the factual situation which this case presents.

### CONCLUSION

Dr. Tsoutsouris' testimony is excluded as inadmissible expert testimony under the principles enunciated in *Daubert.* Dr. Tsoutsouris' failure to discover and consider other causes of the injury make his opinion tantamount to "subjective belief or unsupported speculation." Further, the expert's opinions do not "fit" the facts of this case. Since the Plaintiffs have no other evidence to sustain their burden on the issue of causation, the Plaintiffs have failed to produce sufficient evidence to withstand the entering of summary judgment against them.

For the reasons stated above, the Court finds that Defendants Nike, Inc., Kinney Shoe Corporation and Footlocker are entitled to the entry of summary judgment in their favor. The Court therefore Orders that the Defendants' Motion for Summary Judgment be GRANTED, in all respects, and that Judgment be entered against the Plaintiffs, Donald Tucker and V. Belin Tucker and in favor of Defendants Nike, Inc., Kinney Shoe Corporation and Footlocker.

SO ORDERED this 27th day of July, 1995.